# NOTE

[redacted] [redacted]

| March 15, 2002 | Philadelphia | PA |
|---|---|---|
| [Date] | [City] | [State] |

7146 Cottage Street,Philadelphia,PA 19135
[Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 79,050.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is Sovereign Bank, Federal Savings Bank

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 6.3750 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st day of each month beginning on May 1, 2002 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on April 1, 2032 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 1130 Berkshire Blvd., Wyomissing, PA 19610 or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $493.17 .

**4. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

[redacted] [redacted]



[redacted]

**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.0000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

[redacted] [redacted]

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.
>
> If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

| | |
|---|---|
| _______________ (Seal) -Borrower<br>Jennifer L. Shinn | _______________ (Seal) -Borrower |
| _______________ (Seal) -Borrower | _______________ (Seal) -Borrower |
| _______________ (Seal) -Borrower | _______________ (Seal) -Borrower |
| _______________ (Seal) -Borrower | _______________ (Seal) -Borrower |

*[Sign Original Only]*

[redacted] [redacted]



PAY TO THE ORDER OF
WITHOUT RECOURSE
THIS ___ DAY OF ___ 20__
SOVEREIGN BANK
CINDY L. YOCUM, ASSISTANT VICE PRESIDENT

Santander Bank, N.A. Loan #[redacted]
Freddie Mac Loan #[redacted]

Documents prepared by: SHERI SPONAGLE
On (Date): 5/11/2015
Parce[redacted]

After recording return to:
Santander Bank, N.A.
Mail Code[redacted]
601 Penn St. Reading, PA 19601

THIS MODIFICATION IS TO BE EXECUTED IN DUPLICATE ORIGINALS.
ONE ORIGINAL IS TO BE AFFIXED TO THE ORIGINAL NOTE AND
ONE ORIGINAL IS TO BE RECORDED IN THE LAND RECORDS WHERE
THE SECURITY INSTRUMENT IS RECORDED.

This Loan Modification Agreement ("Modification") is effective 5/1/2015, between JENNIFER L SHINN, ("Borrower"), and Santander Bank, N.A., if applicable, Successor in interest to: SOVEREIGN BANK with respect to the Note and Mortgage or Security Instrument defined and modified in this Agreement ("Lender") and amends and supplements (1) the Note (the "Note") made by the Borrower, dated 3/15/2002, in the original principal sum of U.S. $79,050.00, and (2) the Mortgage, Deed of Trust or Deed to Secure (the "Security Instrument"), recorded on 3/27/2002 in Document #50429671 in COUNTY OF PHILADELPHIA, PENNSYLVANIA. The Security Instrument, which was entered into as security for the performance of the Note, encumbers the real and personal property describe in the Security Instrument (and defined in the Security Instrument as the "Property"), which is located 7146 COTTAGE ST, PHILADELPHIA PA 19135.That real property is described as:

See description attached hereto and made a part hereof:

The Borrower has requested that the Lender modify the terms of the Note and Security Instrument. The Lender has agreed to do so pursuant to the terms and conditions stated in this Modification. In consideration of the agreements made in this Modification, and other good and valuable consideration and Security Instrument as follows: The Borrower and the Lender agree that the provisions of this Modification supersede and replace any inconsistent provisions set forth in the Note and Security Instrument.

1. The Borrower represents that the Borrower __X__ is, _____ is not, the occupant of the Property.
2. The Borrower acknowledges that interest has accrued but not been paid and the Lender has incurred, paid or otherwise advanced taxes, insurance premiums and other expenses necessary to protect or enforce its interest in the Note and the Security Instrument, and that such interest, costs and expenses, in the total amount of $7,915.26 have been added to the indebtedness under the terms of the Note and Security Instrument. As of 5/1/2015 the amount, including such amounts which have

been added to the indebtedness (if any), payable under the Note and Security Instrument (the "Unpaid Principal Balance") is U.S. $70,280.48.

3. The Borrower promises to pay the Unpaid Principal Balance, plus interest, to the order of the Lender, until the unpaid Principal Balance has been paid. Interest will be charged on the Unpaid Principal Balance at the yearly rate of 6.375% (fixed rate), beginning 5/1/2015. The Borrower promises to make monthly payments of principal and interest of U.S. $405.22, beginning on 6/1/2015, and continuing thereafter on the same day of each succeeding month. If on 5/1/2055 (the "Modified Maturity Date"), the Borrower still owes amounts under the Note and the Security Instrument, as amended by this Modification, the Borrower will pay these amounts in full on the modified Maturity Date. The Borrower will make such payments to Santander Bank, N.A., PO Box 12649, Reading, PA 19612 or at such other place as the Lender may require.

4. Except to the extent that they are modified by this Modification, the Borrower will comply with all of the covenants, agreements, and requirements of the Note and the Security Instrument, including without limitation, the Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that the Borrower is obligated to make under the Security Instrument.

5. Nothing in this Modification shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument will remain unchanged and in full effect, and the Borrower and Lender will be bound by, and comply with, all of the terms and provisions thereof, as amended by this Modification.

6. If one or more riders are executed by the Borrower and recorded together with this Modification, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Modification as if the rider(s) were a part of this Modification.

[Check applicable box(es)]

☐ 1-4 Family Rider - Assignment of Rents

☐ Modification due on transfer rider

[To be signed by all Borrowers, endorsers, guarantors, sureties, and other parties signing the Note or Security Instrument].

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement.

SANTANDER BANK, N.A.
if applicable, Successor in interest to: SOVEREIGN BANK with respect to the Note and Mortgage or Security Instrument defined and modified in this Agreement

[redacted]

Name: Sheri Hall
Title: Vice President

COMMONWEALTH OF PENNSYLVANIA, BERKS COUNTY SS:

On this, the 26 day of June, 2015, before me, the undersigned, a Notary Public, personally appeared Sheri Hall, Vice President personally known to me or proved to me on the basis of satisfactory evidence to be such officer of Santander Bank, N.A., a corporation, and that they as such officer, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the Corporation by themselves as such officer, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the
instrument.

Christine Torok
NOTARY PUBLIC

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
CHRISTINE TOROK
Notary Public
CITY OF READING, BERKS COUNTY
My Commission Expires Oct 24, 2017

Jennifer L. Shinn Madden
JENNIFER L SHINN, Borrower

STATE OF PA
COUNTY OF Philadelphia

On this, the 22 (day) of June (month), 2015, before me, the undersigned, a Notary Public, in and for said state, personally appeared **JENNIFER L SHINN, Borrower**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

T.A. [signature]
Notary Public

Original

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
TREVOR A GETTMANN SR
Notary Public
PHILADELPHIA CITY, PHILADELPHIA CNTY
My Commission Expires Feb 14, 2017

# ERROR AND OMISSIONS/COMPLIANCE AGREEMENT

The undersigned Borrower(s) for and in consideration of the Loan Modification Agreement offered by Lender, its successors and/or assigns in the amount of $70,280.48, modifying the original Promissory Note secured by a Security Instrument dated 3/15/2002 agrees to fully cooperate with any reasonable requests made by Lender, or its agent, to correct typographical errors in the Loan Modification Agreement enabling Lender to sell, convey, guarantee or obtain insurance for any investor or institution, including but not limited to, the Federal National Mortgage Association, the Government National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Department of Housing and Urban Development, the Department of Veterans Affairs, or any municipal bonding authority, to ensure enforceability of the Loan Modification Agreement. Requests may include, but are not limited to, all changes, corrections, re-execution or modification of any document related to such loan, as may be required.

The undersigned will comply with all requests within thirty days from the date they are made by Lender or its agent. If the Borrower(s) fail to meet his/her/their obligations, Borrower(s) acknowledge liability for all costs including, but not limited to, actual expenses, legal fees, court costs, and marketing expenses incurred by Lender to enforce its rights under the Loss Mitigation Agreement.

Dated effective this 22 (day) of [redacted] (month), 2015

JENNIFER L SHINN, Borrower

STATE OF PA
COUNTY OF Philadelphia

On this, the 22 (day) of June (month), 2015, before me, the undersigned, a Notary Public, in and for said state, personally appeared **JENNIFER L SHINN, Borrower**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
TREVOR A GETTMANN SR
Notary Public
PHILADELPHIA CITY, PHILADELPHIA CNTY
My Commission Expires Feb 14, 2017

**Order No:** [redacted]
**Reference No:**

---

## Schedule C
## Description and Recital

ALL THAT CERTAIN lot or piece of ground with the buildings and improvements thereon erected,

SITUATE on the Northwest side of Cottage Street at the distance of 400 feet 6inches Northeastward from the Northeast side of Cottage Street at the distance of 400 feet 6 inches Northeastward from the Northeast side of Princeton Street in the 41st Ward of the City of Philadelphia.

CONTAINING in front or breadth on said Cottage Street 16 feet and extending of that width in length depth Northwestward between parallel lines at right angles to said Cottage Street 90 feet including on the rear a 9 feet wide driveway extending Northeastward into St. Vincent Street and communicating at its Southwesternmost end with a 15 feet 6 inches wide driveway extending Southeastward into Cottage Street.

BEING No. 7146 Cottage Street.

TOGETHER with the free and common use, right, liberty and privilege of the aforesaid driveway as and for a passageway and watercourse in common with the owners, tenants and occupiers of the other lots of ground bounding thereon and entitled to the use thereof at all times hereafter, forever.

SUBJECT, however to the proportionate part of the expense of keeping said driveway in good order, condition and repair.

[redacted]

Being the same premises which Kenneth Potts and Nancy Potts, husband and wife by Deed dated 12/29/1989 and recorded 1/2/1990 in Philadelphia County in Deed Book FHS 1526 Page 169 conveyed unto Thomas Daniel Peterman and Cecelia A. Burke, son and mother, their heirs and assigns, in fee.

| | | | |
|---|---|---|---|
| Santander Loan# | [redacted] | Borrower Last Name: | Shinn |
| Investor Loan# | [redacted] | Prepared By: Kristi McMullen | Date: 5/6/2015 |
| Investor | FHLMC | Verified By: | Date: |

**Current Due Date** 09/01/14

CALCULATED FIELDS - DO NOT CHANGE

## FHLMC Terms of Modification

Does Borrower have any additional loan relationships with Santander?

| | |
|---|---|
| Recourse | N |
| Cus User | 3 or6/No |
| MI | None |
| MI/Pool Approval | |

Primary MI Company

Cert #

Pool MI Company

Cert #

**FCL SALE DATE:**

*AMOUNT OF ORIGINAL NOTE **$79,050.00**

| | | | |
|---|---|---|---|
| Existing annual interest rate | Fixed | | 6.375% |
| New modified annual interest rate | Fixed | | 6.375% |
| Effective date of loan modification | | | 5/1/2015 |
| Due date of first modified monthly payment | | | 6/1/2015 |
| Maturity date of existing mortgage | | | 4/1/2032 |
| New maturity date of modified mortgage | New Term 480 | | 5/1/2055 |
| Existing unpaid principal balance on system | | A | $62,365.22 |

| | |
|---|---|
| Current UPB | $62,365.22 |
| Forbeared Principal | $0.00 |
| DO NOT REMOVE FORMULA | $62,365.22 |

Additions to principal balance:

| | | | | |
|---|---|---|---|---|
| ➢ Accrued interest projected up to modification effective date | | | 9 | $2,981.88 |
| ➢ Escrow advanced/due | Total to fund: $910.30 | | | $910.30 |
| ➢ Amount that will fund escrow account | Escrow shortage: | $1,009.11 | | $0.00 |
| ➢ Uncollected Fees on System | | | | $3,867.31 |
| ➢ Outstanding Legal fees and costs | Good Thru Date | | | $590.00 |
| **Total of Additions** | | | B | **$8,349.49** |

Subtractions from principal balance:

| | | | |
|---|---|---|---|
| ➢ **Less borrower's cash contribution** | | C | **$434.23** |
| Total amount to be added to principal | (B - C) | | $7,915.26 |
| **New principle balance of note** | (A+B-C) | D | $70,280.48 |
| **Forebeared Principal** | E | | |
| **Amortizing unpaid principle balance** | (D-E) | F | **$70,280.48** |
| | AMOUNT OVER ORIGINAL NOTE | | **-$8,769.52** |

| | |
|---|---|
| Current P&I | $493.17 |
| Current Escrow | $217.09 |
| | **$710.26** |

| | | |
|---|---|---|
| New modified principal and interest | | $405.22 |
| New modified escrow payment | $201.80 | |
| Escrow shortage spread amount | $16.81 | $218.61 |
| **TOTAL new modified monthly payment** | | $623.83 |
| **MONTHLY SAVINGS** | **$86.43** | |

**Front DTI** ______
**Back DTI** ______

**Amounts due from borrower for modification (certified):**

| | |
|---|---|
| ➢ Borrower cash contribution to reduce principal balance* | $434.23 |
| ➢ Borrower's first modified monthly payment | $623.83 |
| ➢ Total funds required for modification | $1,058.06 |
| ➢ Less unapplied funds (credits) | $434.23 |
| TOTAL DUE FROM BORROWER WITH DOCS | $623.83 |

**All modifications are to be recorded per management. Please make sure you order a title and recording OR a recording quote from Old Republic. In addition, South Carolina requires two witness signatures for each borrower and two witnesses for the Bank. You will need to add these lines to the mod.**

Shinn[redacted]

Prepared By:
Cathy Brown

Return To:
Sovereign Bank
MCS [redacted]
525 Lancaster Avenue, Suite 300
Reading, PA 19611

Parcel Number:
[redacted]

[Space Above This Line For Recording Data]

[redacted]

# MORTGAGE

LN# [redacted]

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated March 15, 2002 , together with all Riders to this document.
**(B) "Borrower"** is Jennifer L. Shinn

Borrower is the mortgagor under this Security Instrument.
**(C) "Lender"** is Sovereign Bank .

Lender is a Federal Savings Bank .

[redacted] [redacted]

organized and existing under the laws of the United States of America .
Lender's address is 1130 Berkshire Boulevard, Wyomissing, PA 19610

.
Lender is the mortgagee under this Security Instrument.
**(D) "Note"** means the promissory note signed by Borrower and dated March 15, 2002 .
The Note states that Borrower owes Lender Seventy Nine Thousand Fifty and no/100 Dollars
(U.S. $79,050.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than April 1, 2032 .
**(E) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(I) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(K) "Escrow Items"** means those items that are described in Section 3.
**(L) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(M) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
**(N) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

[redacted]

Initials:



[redacted]
03/27/2002 04:21PM

**(O) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(P) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender the following described property located in the County [Type of Recording Jurisdiction] of Philadelphia [Name of Recording Jurisdiction]:

which currently has the address of
7146 Cottage Street [Street]
Philadelphia [City], Pennsylvania 19135 [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be

[redacted] [redacted]



[redacted]
Pg: 5 of 18
03/27/2002 04:21PM

paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest

[redacted] [redacted]

Initials:



[redacted]

shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

[redacted] [redacted]



[redacted]

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

[redacted] [redacted]



[redacted]

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

[redacted] [redacted]

Initials:



[redacted]

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

[redacted] [redacted]

Initials:

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be

[redacted] [redacted]

Initials: [handwritten initials]



[redacted]

dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to

[redacted] [redacted]

Initials: ______



[redacted]

13

have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or

[redacted] [redacted]

Initials: 



[redacted]
Pg: 13 of 18
03/27/2002 04:21PM

14

agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

[redacted] [redacted]

Initials: [signature]



[redacted]


/5

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). Lender shall notify Borrower of, among other things: (a) the default; (b) the action required to cure the default; (c) when the default must be cured; and (d) that failure to cure the default as specified may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. Lender shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured as specified, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence to the extent permitted by Applicable Law.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, this Security Instrument and the estate conveyed shall terminate and become void. After such occurrence, Lender shall discharge and satisfy this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waivers.** Borrower, to the extent permitted by Applicable Law, waives and releases any error or defects in proceedings to enforce this Security Instrument, and hereby waives the benefit of any present or future laws providing for stay of execution, extension of time, exemption from attachment, levy and sale, and homestead exemption.

**25. Reinstatement Period.** Borrower's time to reinstate provided in Section 19 shall extend to one hour prior to the commencement of bidding at a sheriff's sale or other sale pursuant to this Security Instrument.

**26. Purchase Money Mortgage.** If any of the debt secured by this Security Instrument is lent to Borrower to acquire title to the Property, this Security Instrument shall be a purchase money mortgage.

**27. Interest Rate After Judgment.** Borrower agrees that the interest rate payable after a judgment is entered on the Note or in an action of mortgage foreclosure shall be the rate payable from time to time under the Note.

[redacted] [redacted]

Initials:



[redacted]

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_______________________ (Seal)
Jennifer L. Shinn -Borrower

_______________________

_______________________ (Seal)
-Borrower

_______________________ (Seal)
-Borrower

_______________________ (Seal)
-Borrower

_______________________ (Seal)
-Borrower

_______________________ (Seal)
-Borrower

_______________________ (Seal)
-Borrower

_______________________ (Seal)
-Borrower

[redacted] [redacted]



[redacted]



17

**Certificate of Residence**

I, Cathy Brown , do hereby certify that the correct address of the within-named Mortgagee is 1130 Berkshire Boulevard, Wyomissing, PA 19610 .

Witness my hand this 15th day of March, 2002 .

Cathy Brown
Cathy Brown Agent of Mortgagee

**COMMONWEALTH OF PENNSYLVANIA,** **County ss:**

On this, the 15th day of March 2002 , before me, the undersigned officer, personally appeared Jennifer L. Shinn

known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged that he/she/they executed the same for the purposes herein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.
My Commission Expires:

NOTARIAL SEAL
ELEANOR M. BRENNAN, Notary Public
City of Philadelphia, Phila. County
My Commission Expires Sept. 25, 2004

Title of Officer

[redacted] [redacted]



[redacted]

**Order No:** [redacted]
**Reference No:**

---

## Schedule C
## Description and Recital

ALL THAT CERTAIN lot or piece of ground with the buildings and improvements thereon erected,

SITUATE on the Northwest side of Cottage Street at the distance of 400 feet 6inches Northeastward from the Northeast side of Cottage Street at the distance of 400 feet 6 inches Northeastward from the Northeast side of Princeton Street in the 41st Ward of the City of Philadelphia.

CONTAINING in front or breadth on said Cottage Street 16 feet and extending of that width in length depth Northwestward between parallel lines at right angles to said Cottage Street 90 feet including on the rear a 9 feet wide driveway extending Northeastward into St. Vincent Street and communicating at its Southwesternmost end with a 15 feet 6 inches wide driveway extending Southeastward into Cottage Street.

BEING No. 7146 Cottage Street.

TOGETHER with the free and common use, right, liberty and privilege of the aforesaid driveway as and for a passageway and watercourse in common with the owners, tenants and occupiers of the other lots of ground bounding thereon and entitled to the use thereof at all times hereafter, forever.

SUBJECT, however to the proportionate part of the expense of keeping said driveway in good order, condition and repair.

[redacted] Pg: 18 of 18
03/27/2002 04:21PM

Being the same premises which Kenneth Potts and Nancy Potts, husband and wife by Deed dated 12/29/1989 and recorded 1/2/1990 in Philadelphia County in Deed Book FHS 1526 Page 169 conveyed unto Thomas Daniel Peterman and Cecelia A. Burke, son and mother, their heirs and assigns, in fee.

**City of Philadelphia Department of Records**

## RECORDING INFORMATION SUMMARY (RIS)

Mtg

[redacted]

The information provided by you will be relied upon by the Department of Records for examination and indexing purposes. If there is any confict between the RIS and the attached document, the information on the RIS shall prevail for examination and indexing purposes.

**RETURN DOCUMENT TO:**
Name: Sovereign Bank
Address: MSC 10-421-LA3
525 Lancaster Avenue, Suite 305
Reading, PA 19611
Telephone:

1. Type of Document

| | | |
|---|---|---|
| ☐ Deed | ☒ Mortgage | ☐ Lease/Memorandum of Lease |
| ☐ Sheriff's Deed | ☐ Release of Mortgage | ☐ Assignment of Lease & Rent |
| ☐ Deed of Condemnation | ☐ Assignment of Mortgage | ☐ Easement |
| ☐ Other Deed | ☐ Satisfaction of Mortgage | ☐ Other ______ (specify) |

2. Date of Document: 3 (month) / 15 (day) / 2002 (year)

3. Grantor/Mortgagor/Assignor/Lessor/Other:
*(Last Name, First Name, Middle Initial)*
(a.) Shinn, Jennifer L.
(b.)
☐ Additional names on **Page 2** of RIS

4. Grantee/Mortgagee/Assignee/Lessee/Other:
*(Last Name, First Name, Middle Initial)*
(a.) Sovereign Bank
(b.)
☐ Additional names on **Page 2** of RIS

REVIEWED

5. Property Address:
(a.) House No. & Street Name: 7146 Cottage Street
Condo Name (if applicable): ______ Unit # ______ Philadelphia, PA Zip Code: 19135
BRT Account # (optional): ______ Parcel Identification Number (PIN) (optional): [redacted]
☐ Additional addresses on **Page 2** of RIS

6. Grantee's Mailing Address (Deed Only):
(If Grantee is at a different address than the Property Address listed in Section 6, complete this section.)
Grantee or Designee Name:
House & Street Name:
City: ______ State: ______ Zip Code: ______

7. Recording Information to be Referenced. Mortgage to be released/satisfied/ assigned/modified:
(a.) Name of Original Mortgagee:
Recording Date of Original Mortgage: ____ (month) / ____ (day) / ____ (year)
Recorder's Index Information of Original Mortgage:
Initials, Book and Page or Doc. ID#
☐ Additional references on **Page 2** of RIS

8. Optional Information
☐ Consolidation ☐ Subdivision

Cathy Brown
Preparer's Name

[redacted]
Preparer's Telephone Number

Cathy Brown
Preparer's Signature

FOR DEPT USE ONLY
[redacted]
Pg: 1 of
03/27/2002 04:21PM
Doc Id: 50429671
Receipt #: [redacted]
Rec Fee: 43.50
This Document Recorded
03/27/2002
04:21PM
Doc Code: M
Commissioner of Records, City of Philadelphia

82-337

**SANTANDER BANK, NATIONAL ASSOCIATION**

**ASSISTANT SECRETARY'S CERTIFICATE**

October 17, 2013

I, Gerard A. Chamberlain, Assistant Secretary of Santander: Bank, National Association, a national bank (the "Bank"), hereby certify that:

1. Attached hereto as Exhibit A is a true and correct copy of the Bank's Articles of Association in effect on the date hereof;
2. Attached hereto as Exhibit B is a true and correct copy of resolutions adopted by the Bank's Board of Directors at a meeting duly convened on March 13, 2013, and those resolutions have not been rescinded, amended, or modified and remain in full force and effect; and
3. Attached hereto as Exhibit C is a letter from the Office of the Comptroller of the Currency indicating that it would change its records to reflect the Bank's name change on the date hereof to Santander Bank, National Association.

**IN WITNESS WHEREOF,** I have executed and delivered this Assistant Secretary's Certificate as of the date first written above.

Gerard A. Chamberlain,
Assistant Secretary

# EXHIBIT A

# Articles of Association

For organizing an association to perform any lawful activities of national banks, the undersigned enter into the following Articles of Association:

**FIRST**. The title of this association shall be Santander Bank, National Association.

**SECOND.** The main office of the association shall be located in the city of Wilmington in the County of New Castle and State of Delaware.

The general business of the association shall be conducted at its main office and its branches

**THIRD.** The board of directors of this association shall consist of not less than five nor more than twenty-five persons, unless the Office of the Comptroller of the Currency ("**OCC**") has exempted the bank from the 25-member limit. The exact number is to be fixed and determined from time to time by resolution of a majority of the full board of directors or by resolution of a majority of the shareholders at any annual or special meeting thereof. Each director shall own common or preferred stock of the association or of a holding company owning the association, with either an aggregate par, fair market, or equity value of $1,000. Determination of these values may be based as of either (I) the date of purchase, or (ii) the date the person became a director, whichever value is greater. Any combination of common or preferred stock of the association or holding company may be used.

Any vacancy in the board of directors may be filled by action of a majority of the remaining directors between meetings of shareholders. The board of directors may not increase the number of directors between meetings of shareholders to a number which:

(1) exceeds by more than two the number of directors last elected by shareholders when the number was 15 or less; or

(2) exceeds by more than four the number of directors last elected by shareholders where the number was 16 or more, but in no event shall the number of directors exceed 25, unless the OCC has exempted the bank from the 25-member limit.

Directors shall be elected for terms of one year and shall serve until their successors are elected and qualified. Terms of directors, including terms of directors selected to fill vacancies, shall expire at the next regular meeting of shareholders at which directors are elected, unless they resign or are removed from office.

Despite the expiration of a director's term, the director shall continue to serve until his or her successor is elected and qualifies or until there is a decrease in the number of directors and his or her position is eliminated.

Honorary or advisory members of the board of directors, without voting power or power of final decision in matters concerning the business of the association, may be appointed by resolution of a majority of the full board of directors, or by resolution of shareholders at any annual or special meeting. Honorary or advisory directors shall not be counted to determine the number of directors of the association or the presence of a quorum for any board action, and shall not be required to own qualifying shares.

**FOURTH**. There shall be an annual meeting of the shareholders to elect directors and transact whatever other business may be brought before the meeting. It shall be held at the main office or any other convenient place the board of directors may designate, on the day of each year specified therefore in the Bylaws, or if that day falls on a legal holiday in the state in which the association is located, on the next following banking day. If no election is held on the day fixed or in the event of a legal holiday on the following banking day, an election may be held on any subsequent day within 60 days of the day fixed, to be designated by the board of directors, or, if the directors fail to fix the day, by shareholders representing two-thirds of the shares issued and outstanding. Advance notice of the time, place, and purpose of all shareholders' meetings must be provided to shareholders at least 10 days prior to the meeting by first class mail, unless the OCC determines that an emergency circumstance exists. Where a national bank is a wholly-owned subsidiary, the sole shareholder is permitted to waive notice of the shareholders' meeting. The Articles of Association, Bylaws, or law applicable to a national bank may require a longer period of notice.

In all elections of directors, the number of votes cast by each common shareholder will be determined by multiplying the number of shares he or she owns by the number of directors to be elected. On all matters, including in all elections of directors, each common shareholder shall be entitled to one vote for each share of stock held by him or her. Stockholders shall not be permitted to cumulate their votes for the election of directors.

If the issuance of preferred stock with voting rights has been approved by the OCC and authorized by a vote of shareholders owning a majority of the common stock of the association after receiving not less than five days notification by registered or certified mail pursuant to action taken by the board of directors, preferred shareholders will not have cumulative voting rights and will not be included within the same class as common shareholders, to elect directors.

Nominations for election to the board of directors may be made by the board of directors or by any stockholder of any outstanding class of capital stock of the association entitled to vote for election of directors. Nominations other than those made by or on behalf of the existing management shall be made in writing and be delivered or mailed to the president of the association no less than 14 days nor more than 50 days prior to any meeting of shareholders called for the election of directors; provided, however, that if less than 21 days notice of the meeting is given to shareholders, such nominations shall be mailed or delivered to the president of the association no later than the close of business on the seventh day following the day on which notice of the meeting was mailed. Such notification shall contain the following information to the extent known to the notifying shareholder:

(1) The name and address of each proposed nominee.

(2) The principal occupation of each proposed nominee.

(3) The total number of shares of capital stock of the association that will be voted for each proposed nominee.

(4) The name and residence address of the notifying shareholder.

(5) The number of shares of capital stock of the association owned by the notifying shareholder.

The chairperson of the meeting may, in his/her discretion, disregard nominations not made in accordance herewith. The vote tellers may disregard all votes cast for each such nominee. No bylaw may unreasonably restrict the nomination of directors by shareholders.

A director may resign at any time by delivering written notice to the board of directors, its chairperson, or to the association, which resignation shall be effective when the notice is delivered unless the notice specifies a later effective date.

A director may be removed by shareholders at a meeting called to remove him or her, when notice of the meeting states that the purpose or one of the purposes is to remove him or her, if there is a failure to fulfill one of the affirmative requirements for qualification, or for cause.

**FIFTH.** The authorized amount of capital stock of this association shall be:

15,000,000 shares of common stock of the par value of one dollar ($1.00) each; 7,500,000 shares of perpetual preferred stock; but said capital stock may be increased or decreased from time to time, according to the provisions of the laws of the United States.

No holder of shares of the capital stock of any class of the association shall have any preemptive or preferential right of subscription to any shares of any class of stock of the association, whether now or hereafter authorized, or to any obligations convertible into stock of the association, issued, or sold, nor any right of subscription to any thereof other than such, if any, as the board of directors, in its discretion may from time to time determine and at such price as the board of directors may from time to time fix. Preemptive rights also must be approved by a vote of holders of two-thirds of the bank's outstanding voting shares.

Unless otherwise specified herein or required by law, (1) shareholders owning a majority voting interest in the outstanding voting stock must approve all matters requiring shareholder action, including amendments to the Articles of Association, and (2) each shareholder shall be entitled to one vote per share.

Unless otherwise specified herein or required by law, all shares of voting stock shall be voted together as a class, on any matters requiring shareholder approval. If a proposed amendment would affect two or more classes or series in

the same or a substantially similar way, all the classes or series so affected, must vote together as a single voting group on the proposed amendment.

Shares of common stock shall be subject to the following dividend, voting, liquidation, preemptive, conversion, assessment, and other rights.

(1) Each holder of shares of common stock shall be entitled to one vote for each share held by such holder and shall have unlimited voting rights.

(2) Whenever there shall have been paid, or declared and set aside for payment, to the holders of the outstanding shares of any class of stock having preference over the common stock as to the payment of dividends, the full amount of dividends and of a sinking fund, retirement fund or other retirement payment, if any, to which such holders are respectively entitled in preference to the common stock, then dividends may be paid on the common stock and on any class or series of stock entitled to participate therewith as to the dividends out of any assets legally available for payment of dividends.

(3) In the event of any liquidation, dissolution, or winding up of the bank, the holders of the common stock (and the holders of any class or series of stock entitled to participate with the common stock in the distribution of assets) shall be entitled to receive, in cash or in kind, the assets of the bank available for distribution remaining after: (i) payment or provision for payment of the bank's debts and liabilities; (ii) distributions or provision for distributions in settlement of its liquidation account, if any; and (iii) distributions or provision for distributions to holders of any class or series of stock having preference over the common stock in the liquidation, dissolution, or winding up of the bank. Each share of common stock shall have the same relative rights as and be identical in all respects with all the other shares of common stock.

The Board of Directors is hereby empowered to authorize by resolution or resolutions from time to time the issuance of one or more classes or series of preferred stock and to fix the par value, designations, powers, preferences and relative, participating, optional or other rights, if any, and the qualifications, limitations or restrictions thereof, if any, with respect to each such class or series of preferred stock and the number of shares constituting each such class or series, and to increase or decrease the number of shares of any such class or series to the extent permitted by law. Any issuance of preferred stock with voting rights shall be approved by the OCC and authorized by a vote of shareholders owning a majority of the common stock of the association after receiving not less than five days notification by registered or certified mail pursuant to action taken by the board of directors.

Shares of one class or series may be issued as a dividend for shares of the same class or series on a pro rata basis and without consideration. Shares of one class or series may be issued as share dividends for a different class or series of stock if approved by a majority of the votes entitled to be cast by the class or series to be issued, unless there are no outstanding shares of the class or series to be issued. Unless otherwise provided by the board of directors, the record date for determining shareholders entitled to a share dividend shall be the date authorized by the board of directors for the share dividend.

Unless otherwise provided in the Bylaws, the record date for determining shareholders entitled to notice of and to vote at any meeting is the close of business on the day before the first notice is mailed or otherwise sent to the shareholders, provided that in no event may a record date be more than 70 days before the meeting.

If a shareholder is entitled to fractional shares pursuant to preemptive rights, a stock dividend, consolidation or merger, reverse stock split or otherwise, the association may: (a) issue fractional shares; (b) in lieu of the issuance of fractional shares, issue script, or warrants entitling the holder to receive a full share upon surrendering enough script or warrants to equal a full share; (c) if there is an established and active market in the association's stock, make reasonable arrangements to allow the shareholder to realize a fair price through sale of the fraction, or purchase of the additional fraction required for a full share; (d) remit the cash equivalent of the fraction to the shareholder; or (e) sell full shares representing all the fractions at public auction or to the highest bidder after having solicited and received sealed bids from at least three licensed stock brokers; and distribute the proceeds pro rata to shareholders who otherwise would be entitled to the fractional shares. The holder of a fractional share is entitled to exercise the rights for shareholder, including the right to vote, to receive dividends, and to participate in the assets of the association upon liquidation, in proportion to the fractional interest. The holder of script or warrants is not entitled to any of these rights, unless the script or warrants explicitly provide for such rights. The script or warrants may be subject to such additional conditions as: (1) that the script or warrants will become void if not exchanged for full shares before a specified date; and (2) that the shares for which the script or warrants are exchangeable may be sold at the option of the association and the proceeds paid to scriptholders.

The association, at any time and from time to time, may authorize and issue debt obligations, whether or not subordinated, without the approval of the shareholders. Obligations classified as debt, whether or not subordinated, which may be issued by the association without the approval of shareholders, do not carry voting rights on any issue, including an increase or decrease in the aggregate number of the securities, or the exchange or reclassification of all or part of securities into securities of another class or series.

**SIXTH.** The board of directors shall appoint one of its members president of this association, and one of its members chairperson of the board and shall have the power to appoint one or more vice presidents, a secretary who shall keep minutes of the directors' and shareholders' meetings and be responsible for authenticating the records of the association, and such other officers and employees as may be required to transact the business of this association. A duly appointed officer may appoint one or more officers or assistant officers if authorized by the board of directors according to the Bylaws.

The board of directors shall have the power to:

(1) Define the duties of the officers, employees, and agents of the association.

(2) Delegate the performance of its duties, but not the responsibility for its duties, to the officers, employees, and agents of the association.

(3) Fix the compensation and enter into employment contracts with its officers and employees upon reasonable terms and conditions consistent with applicable law.

(4) Dismiss officers and employees.

(5) Require bonds from officers and employees and to fix the penalty thereof.

(6) Ratify written policies authorized by the association's management or committees of the board.

(7) Regulate the manner in which any increase or decrease of the capital of the association shall be made, provided that nothing herein shall restrict the power of shareholders to increase or decrease the capital of the association according to law, and nothing shall raise or lower from two-thirds the percentage required for shareholder approval to increase or reduce the capital.

(8) Manage and administer the business and affairs of the association.

(9) Adopt initial Bylaws for managing the business and regulating the affairs of the association that are not inconsistent with law or the Articles of Association.

(10) Amend or repeal the Bylaws, except to the extent that the Articles of Association reserve this power in whole or in part to shareholders.

(11) Make contracts.

(12) Generally perform all acts that are legal for a board of directors to perform.

**SEVENTH.** The board of directors shall have the power to change the location of the main office to any authorized branch within the limits of Wilmington, Delaware without the approval of the shareholders, or with a vote of shareholders owning two-thirds of the stock of such association for a relocation outside such limits and upon receipt of a certificate of approval from the Comptroller of the Currency, to any other location within or outside the limits of Wilmington, Delaware, but not more than 30 miles beyond such limits. The board of directors shall have the power to establish or change the location of any branch or branches of the association to any other location permitted under applicable law, without approval of shareholders, subject to approval by the Comptroller of the Currency.

**EIGHTH.** The corporate existence of this association shall continue until termination according to the laws of the United States.

**NINTH.** The board of directors of this association, or any one or more shareholders owning, in the aggregate, not less than 10 percent of the stock of this association, may call a special meeting of shareholders at any time. A national bank must mail shareholders notice of the time, place, and purpose of all shareholders' meetings at least 10 days prior to the meeting by first class mail, unless the OCC determines that an emergency circumstance exists. Where a

national bank is a wholly-owned subsidiary, the sole shareholder is permitted to waive notice of the shareholders' meeting. The Bylaws, or law applicable to a national bank may require a longer period of notice. Unless otherwise provided herein or by the Bylaws, any action requiring approval of shareholders must be effected at an annual or special meeting. If action requiring approval of the shareholders is effected at an annual or special meeting, the meeting must be duly called.

**TENTH.** The bank may make or agree to make indemnification payments to an institution-affiliated party, as defined at 12 USC 1813(u), for an administrative proceeding or civil action initiated by any federal banking agency, that are reasonable and consistent with the requirements of 12 USC 1828(k) and the implementing regulations there under.

The bank may indemnify an institution-affiliated party, as defined at 12 USC 1813(u), for damages and expenses, including the advancement of expenses and legal fees, in cases involving an administrative proceeding or civil action not initiated by a federal banking agency, in accordance with Delaware General Corporation Law, Del. Code Ann. tit. 8 (1991, as amended 1994, and as amended thereafter), provided such payments are consistent with safe and sound banking practices.

**ELEVENTH.** These Articles of Association may be amended at any regular or special meeting of the shareholders by the affirmative vote of the holders of a majority of the stock of this association, unless the vote of the holders of a greater amount of stock is required by law, and in that case by the vote of the holders of such greater amount. The association's board of directors may propose one or more amendments to the Articles of Association for submission to the shareholders.

# EXHIBIT B

**RESOLVED**, that the Board of Directors hereby approves changing this Bank's name to Santander Bank, National Association; directs that this name change be submitted to the Bank's shareholders for their approval and, upon such approval, that the Bank's Articles of Association and Bylaws be amended to reflect that name change; and directs any officer of this Bank to prepare or cause to be prepared, execute and file or cause to be filed any filing or other document, and to take any other action related or incident thereto to effect such name change.

# EXHIBIT C

Office of the Comptroller of the Currency

Northeastern District
340 Madison Ave., Fifth Floor
New York, NY 10173

October 1, 2013

Mr. Gerard A. Chamberlain
Senior Vice President and Counsel
Sovereign Bank, National Association
75 State Street
Boston, MA 02109

Re: Change in Corporate Title
Sovereign Bank, National Association. Wilmington, Delaware
Control No.: [redacted] NE-TitleChange [redacted] Charter No.: [redacted]

Dear Mr. Chamberlain:

The Office of the Comptroller of the Currency ("OCC") has received your letter dated September 27, 2013, concerning the change in corporate title and amendment to Article First of the above-referenced bank's Articles of Association. The OCC will amend its records to reflect that effective October 17, 2013, the corporate title of Sovereign Bank, National Association will change to "Santander Bank, National Association."

If you have any questions concerning this matter, please contact Meisha M. Bootman, Licensing Specialist, at [redacted] or by e-mail at [redacted]

Sincerely,

Steven Maggio
Director for District Licensing

cc: Vance S. Price, OCC/Large Banks

Sovereign | Santander

To: Whom It May Concern
From: Heather Birch
Subject: Merger Related Name Changes

Sovereign Bank acquired Waypoint Bank in February 2005.
Harris Savings Association was renamed to Harris Savings Bank in July 1991.
Harris Savings Bank was renamed to Waypoint Bank in October 2000.
Waypoint Bank acquired York Federal Saving and Loan Association in October 2000.
York Federal Savings and Loan Association acquired Spartan Building and Loan Association in June 1989.
Waypoint Bank acquired First Federal Savings and Loan Association of Harrisburg in April 1996.
Waypoint Bank acquired Heritage Federal Savings and Loan Association in June 1991.
Waypoint Bank acquired Carlisle Building and Loan Association in January 1988.
Waypoint Bank acquired Manheim Savings and Loan Association in July 1984.
Waypoint Bank acquired Conestoga Savings and Loan Association in August 1982.
Conestoga Savings and Loan Association acquired Ephrata Building and Loan Association in January 1980.
Waypoint Bank acquired West Shore Savings and Loan Association in January 1982.
Sovereign Bank acquired Nantucket Bank in July 2004.
Sovereign Bank acquired Compass Bank for Savings in July 2004.
Compass Bank for Savings acquired Abington Savings Bank in April 2004.
Abington Savings Bank acquired Massachusetts Cooperative Bank in September 2002.
Abington Savings Bank acquired Hull Cooperative Bank in June 1994.
Abington Savings Bank acquired Landmark Bank for Savings in June 1992.
Compass Bank for Savings acquired Bay State Federal Savings Bank in June 2003.
Bay State Federal Savings Bank acquired Union Federal Savings Bank in February 1997.
Compass Bank for Savings acquired Sandwich Cooperative Bank in December 1998.
Sandwich Cooperative Bank acquired Plymouth Federal Savings Association in March 1994.
Sandwich Cooperative Bank acquired Wareham Cooperative Bank in May 1982.
Compass Bank for Savings acquired Martha's Vineyard National Bank in December 1994.
Compass Bank for Savings acquired Plymouth Federal Savings Association in March 1994.
Compass Bank for Savings acquired Fall River Savings Bank in April 1986.
Sovereign Bank acquired Independence Community Bank in September 2006.
Independence Community Bank acquired SI Bank & Trust in April 2004.
Independence Community Bank acquired Statewide Savings Bank in January 1996.
Independence Community Bank acquired Broad National Bank in July 1999.
Independence Community Bank acquired Bay Ridge Federal Savings Bank in January 1996.
Independence Community Bank acquired The Long Island City Savings and Loan Association in April 1992.
Independence Savings Bank was renamed to Independence Community Bank in September 1998.
South Brooklyn Savings Bank was renamed to Independence Savings Bank in June 1975.

Heather Birch
Banking Officer
Sovereign Bank

Sept 2006

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
ANNAMARIE SPEICHER, Notary Public
City of Reading, Berks County
My Commission Expires October 11, 2012

Sovereign Bank is a wholly owned subsidiary of Banco Santander, S.A. Sovereign and its logo and Santander and its logo are registered trademarks of Sovereign Bank and Santander, respectively, or their affiliates or subsidiaries in the United States and other countries.

Sovereign | Santander

To: Whom It May Concern
From: Heather Birch
Subject: Merger Related Name Changes

Acquisitions and mergers listed chronologically:
National Westminster Bank acquired National Bank of North America in November 1983.
Fleet National Bank (a.k.a. Fleet Bank) acquired Merrill Bankshares, Bangor, ME (now Fleet Bank of Maine) in June 1986.
Fleet Financial Group and Norstar Bancorp merged creating Fleet / Norstar Financial Group in April 1988.
Shawmut Bank acquired assets of Framingham Trust Co. from FDIC IN June of 1988.
Fleet National Bank (a.k.a. Fleet Bank) acquired Indian Head Banks, Nashua, NH September 1988.
Fleet National Bank (a.k.a. Fleet Bank) acquired Connecticut Bank &Trust in January 1991.
Fleet / Norstar Financial Group (a.k.a. Fleet Bank) acquire Bell Financial Services in June 1991.
National Westminster Bank acquired First Jersey National Bank in December 1991.
National Westminster Bank acquired Port Funding, Inc. of Port Jefferson, NY in November 1992.
Fleet Bank acquired Bank of New England in 1993.
Connecticut National Bank changed its name to Shawmut Bank in January 1993.
Fleet Bank acquired Heritage Bank in January 1993.
National Westminster Bank acquired Central Jersey Bank & Trust in September 1994.
Shawmut Bank acquired New Dartmouth Bank (successor to First Federal Bank and New Hampshire Savings Bank South) in January 1995.
Fleet Bank acquired Shawmut Bank in December 1995.
Fleet Bank acquired National Westminster Bank in May 1996.
Bank Boston, N.A. (formerly known as First National Bank of Boston) acquired Bay Bank in May 1997.
Sovereign Bank acquired the Fleet Bank Automotive Financial Division on September 1997.
Sovereign Bank acquired Main Line Federal Savings in September 1998.
Fleet Bank acquired Bank Boston, N.A. in January 1999.
Sovereign Bank acquired First Home Savings Bank in April 1999.
Sovereign Bank acquired Trenton Savings Bank in June 1999.
Sovereign Bank acquired the former Bank Boston, N.A. Automotive Lending Division from Fleet Bank in May 2000.
Sovereign Bank acquired First Essex Bank in February 2004.
The terms "Fleet Bank", "Fleet Services", "Fleet Services Corp", "Fleet Financial Group", "Fleet". "Fleet, N.A.", "Fleet National Bank", "Fleet Bank, National Association", "Fleet Bank, N.A.", " Shawmut Bank", "Shawmut Bank, N.A.", "Shawmut National Bank", 'Shawmut National Bank of ____________ County", "CNB", "Nat West", et al, have been used collectively and individually to represent the larger corporation and are covered by the aforementioned mergers and acquisition broad definitions.

Heather Birch
Banking Officer
Sovereign Bank

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
ANNAMARIE SPEICHER, Notary Public
City of Reading, Berks County
My Commission Expires October 11, 2012

Sovereign Bank is a wholly owned subsidiary of Banco Santander, S.A. Sovereign and its logo and Santander and its logo are registered trademarks of Sovereign Bank and Santander, respectively, or their affiliates or subsidiaries in the United States and other countries.

SOVEREIGN BANK

- **INDEPENDENCE COMMUNITY BANK**
- STATEN ISLAND SAVINGS BANK
- SIB MORTGAGE CORP.
- SIB MORTGAGE CORP. D/B/A IVY MORTGAGE
- HOWELL STATE BANK
- SOUTH BROOKLYN SAVINGS BANK
- INDEPENDENCE SAVINGS BANK
- WESTERLIEGH FEDERAL SAVINGS AND LOAN ASSOCIATION
- STATE SAVINGS, FSB
- FEDERAL SAVINGS AND LOAN ASSOCIATION OF NEWBURGH, NY
- LONG ISLAND CITY SAVINGS AND LOAN ASSOCIATION
- BAY RIDGE FEDERAL SAVINGS BANK
- INDEPENDENCE COMMUNITY BANK CORP.
- BAY RIDGE BANCORP, INC.
- THE LONG ISLAND CITY FINANCE CORP.
- BROAD NATIONAL BANK
- STATEWIDE SAVINGS BANK, SLA
- ARCH FEDERAL SAVINGS AND LOAN ASSOCIATION
- GARWOOD SAVINGS AND LOAN ASSOCIATION
- DELAWARE VALLEY SAVINGS AND LOAN ASSOCIATION
- SI BANK & TRUST
- FIRST STATE BANK
- GATEWAY STATE BANK
- NASSAU SAVINGS AND LOAN ASSOCIATION
- SERIAL FEDERAL SAVINGS AND LOAN ASSOCIATION OF NEW YORK CITY
- RICHMOND COUNTY FEDERAL SAVINGS AND LOAN ASSOCIATION
- **WAYPOINT BANK**
- HARRIS BUILDING AND LOAN
- MECHANICS BUILDING AND LOAN OF LEBANON
- HARRIS SAVINGS BANK
- HARRIS SAVINGS ASSOCIATION
- YORK FEDERAL SAVINGS AND LOAN ASSOCIATION
- SPARTAN BUILDING AND LOAN ASSOCIATION
- FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF HARRISBURG
- AVSTAR MORTGAGE CORP.
- FIRSTAR MORTGAGE CORP.
- HERITAGE FEDERAL SAVINGS ASSOCIATION
- CARLISLE BUILDING AND LOAN ASSOCIATION
- MANHEIM SAVINGS AND LOAN ASSOCIATION
- CONESTOGA SAVINGS AND LOAN ASSOCIATION

- EPHRATA BUILDING AND LOAN ASSOCIATION
- WEST SHORE SAVINGS AND LOAN ASSOCIATION
- **COMPASS BANK FOR SAVINGS**
- BAY STATE FEDERAL SAVINGS BANK
- UNION FEDERAL SAVINGS BANK
- BROOKLINE FEDERAL SAVINGS AND LOAN ASSOCIATION
- SANDWICH CO-OPERATIVE BANK
- PLYMOUTH FEDERAL SAVINGS ASSOCIATION
- WAREHAM CO-OPERATIVE BANK
- MARTHA'S VINEYARD NATIONAL BANK
- NEW BEDFORD FIVE CENTS SAVINGS BANK
- NANTUCKET BANK
- OLD COLONY MORTGAGE CORP.
- **ABINGTON SAVINGS BANK**
- MASSACHUSETTS CO-OPERATIVE BANK
- HULL CO-OPERATIVE BANK
- **FIRST ESSEX BANK**
- PELHAM BANK AND TRUST CO.
- FIRST ESSEX SAVINGS BANK OF NEW HAMPSHIRE
- BROADWAY SAVINGS BANK
- ESSEX BROADWAY SAVINGS BANK
- FIRST ESSEX BANCORP OF NH
- FORTUNE GUARANTY SAVINGS BANK
- FIRST ESSEX BANK, FSB
- **MAIN STREET BANK**
- BERKS COUNTY BANK
- HERITAGE NATIONAL BANK
- SCHUYLKILL HAVEN TRUST
- MINERS NATIONAL BANK OF SHENANDOAH
- FIRST NATIONAL BANK OF TAMAQUA

- **TRENTON SAVINGS BANK, FSB**
- BURLINGTON COUNTY BANK
- CARTERET FEDERAL SAVINGS BANK
- ADMIRAL-BUILDERS SAVINGS & LOAN ASSOC.
- FIRST FEDERAL SAVINGS & LOAN ASSOC. OF MONTGOMERY COUNTY
- MOUNTAIN SECURITY SAVINGS BANK
- MIDTOWN SAVINGS & LOAN ASSOC.
- FIRST FEDERAL SAVINGS & LOAN ASSOC.
- BARTON SAVINGS & LOAN ASSOC.
- RIVER EDGE SAVINGS & LOAN ASSOC.
- MAHWAH SAVINGS & LOAN ASSOC.
- LAWRENCE BROOK SAVINGS & LOAN ASSOC.
- CAPITAL-ST. GEORGE SAVINGS & LOAN ASSOC.
- STACY SAVINGS & LOAN ASSOC.

- CO-OPERATIVE SAVINGS & LOAN ASSOC. OF BERGEN COUNTY
- BURLINGTON SAVINGS BANK
- **CARNEGIE BANK, NA**
- **FIRST HOME SAVINGS BANK, FSB**
- WHITE EAGLE FEDERAL SAVINGS BANK
- FIDELITY MUTUAL SAVINGS & LOAN ASSOC.
- SURETY BUILDING & LOAN ASSOC.
- YORKSHIP SQUARE SAVINGS & LOAN ASSOC.
- **MAIN LINE BANK**
- MAIN LINE FEDERAL SAVINGS BANK
- PHILADELPHIA MORTGAGE CORP.
- COMMONWEALTH STATE BANK
- SUBURBAN FEDERAL SAVINGS BANK
- MEDIA FEDERAL SAVINGS'& LOAN ASSOC.

- WYOMISSING SUBURBAN BUILDING AND LOAN ASSOCIATION
- WYOMISSING BUILDING AND LOAN ASSOCIATION
- WYOMISSING BUILDING AND SAVINGS ASSOCIATION
- WYOMISSING FEDERAL SAVINGS AND LOAN ASSOCIATION
- PROVIDENT FEDERAL SAVINGS AND LOAN ASSOCIATION
- WYOMISSING PROVIDENT FEDERAL SAVINGS AND LOAN ASSOCIATION
- NEW HOME SAVINGS AND LOAN ASSOCIATION
- KUTZTOWN BUILDING AND LOAN ASSOCIATION
- UNION BUILDING AND LOAN ASSOCIATION
- INDUSTIAL BUILDING AND LOAN ASSOCIATION OF LANCASTER
- HOME BUILDING AND LOAN ASSOCIATION OF LANCASTER
- NEW HOME SAVINGS AND LOAN ASSOCIATION
- FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF LANCASTER
- NEW HOLLAND BUILDING AND LOAN ASSOCIATION
- MY. JOY BUILDING AND LOAN ASSOCIATION
- WYOMISSING NEW HOME FEDERAL BUILDING AND LOAN ASSOCIATION
- MANATAWNY BUILDING AND LOAN ASSOCIATION
- FIRST FEDERAL SAVINGS AND LOAN OF ALLENTOWN
- NEW HOME FEDERAL SAVINGS AND LOAN ASSOCIATION
- PENN SAVINGS BANK, FSB
- BANKERS SAVINGS
- THE PERTH AMBOY SAVINGS INSTITUTION
- BOONTON MOUNTAIN SAVINGS AND LOAN ASSOCIATION
- OCEAN INDEPENDENT BANK
- FIRST STATE SAVINGS AND LOAN ASSOCIATION

- FIRST DEWITT BANK
- FIRST DEWITT SAVINGS BANK
- FIRST DEWITT SAVINGS AND LOAN ASSOCIATION
- DEWITT SAVINGS AND LOAN ASSOCIATION
- CHARTER FEDERAL SAVINGS BANK
- CHARTER FEDERAL SAVINGS AND LOAN ASSOCIATION
- CEDAR GROVE SAVINGS AND LOAN ASSOCIATION
- WEST JERSEY COMMUNITY BANK
- COLONIAL STATE BANK
- MUTUAL AID SAVINGS AND LOAN ASSOCIATION
- HARMONIA SAVINGS BANK
- JERSEY SHORE SAVINGS AND LOAN ASSOCIATION
- KEYSTONE SAVINGS AND LOAN ASSOCIATION
- SEASIDE SAVINGS AND LOAN ASSOCIATION
- SHIP BOTTOM SAVINGS AND LOAN ASSOCIATION
- UNITED SAVINGS AND LOAN ASSOCIATION
- NASSUA SAVINGS AND LOAN ASSOCIATION
- YARDLEY SAVINGS AND LOAN ASSOCIATION

Office of Thrift Supervision
Department of the Treasury
1700 G Street, N.W., Washington, D.C. 20552 • [redacted]

# CERTIFICATE OF MERGER

**REFERENCE:** Independence Community Bank
Brooklyn, New York

I, Roslyn E. Weeks, Corporate Secretary, Office of Thrift Supervision, hereby certify, according to the records of the Office of Thrift Supervision, Department of the Treasury, Washington, DC:

1. Independence Community Bank, Brooklyn , New York, was incorporated under the laws of the State of New York to transact the business of a State Savings Bank;

2. Effective September 8, 2006, Independence Community Bank, Brooklyn, New York, merged with and into Sovereign Bank, Wyomissing, Pennsylvania, and Sovereign Bank, Wyomissing. Pennsylvania was the surviving institution and ;

3. Sovereign Bank, Wyomissing, Pennsylvania, is a federally chartered savings bank , and its charter is in full force and effect.

**DATED** this 14th day of September 2006.

Roslyn E. Weeks
**Roslyn E. Weeks**
**Corporate Secretary**

The foregoing instrument was subscribed and sworn to before me by Roslyn E. Weeks, Corporate Secretary, Office of Thrift Supervision, this 14th day of September, 2006.

Jean B. Gray
**Jean B. Gray**
**Notary Public, District of Columbia**
**My Commission Expires: 4/14/2010**

Each depositor insured to at least $250,000 per insured bank

BankFind Home  Return to BankFind Results  Questions & Suggestions

# Sovereign Bank, National Association(FDIC #: [redacted]

## Status: Active • Insured Since March 10, 1938

## Sovereign Bank, National Associationis an active bank

Data as of: May 1, 2013

Overview  Locations  History  Identifications

### History of Sovereign Bank, National Association (FDIC #: [redacted] in Wyomissing, PA

**Show Acquisitions**

| Date | Event |
|---|---|
| 1/1/1907 | Institution established: Original name:New Home Federal Savings and Loan Association [redacted] |
| 7/31/1976 | Acquired New Home Savings and Loan Association [redacted] in READING, PA |
| 8/31/1981 | Acquired First Federal Savings and Loan Association [redacted] in ALLENTOWN, PA |
| 1/31/1984 | Acquired First Federal Savings and Loan Association [redacted] in LANCASTER, PA |
| 2/29/1984 | Changed organization type to MUTUAL SAVINGS BANK |
| 2/29/1984 | Changed name to **Penn Savings Bank FSB** [redacted] |
| 12/31/1986 | Changed organization type to STOCK SAVINGS BANK |
| 8/23/1991 | Acquired Nassau Federal Savings and Loan Association [redacted] n PRINCETON, NJ |
| 9/6/1991 | Acquired United Savings and Loan Association of Trenton, F.A. [redacted]) in TRENTON, NJ |
| 12/31/1991 | Changed name to **Sovereign Bank, A Federal Savings Bank** [redacted] |
| 12/31/1991 | Acquired Yardley Bank for Savings, FSB ([redacted] in YARDLEY, PA |
| 9/11/1992 | Acquired Jersey Shore Savings and Loan Association [redacted] in TOMS RIVER, NJ |
| 1/16/1993 | Acquired Harmonia Savings Bank [redacted] in ELIZABETH, NJ |
| 8/27/1993 | Acquired Home Unity Federal Savings and Loan Association [redacted] in LAFAYETTE HILL, PA as part of a government assisted transaction. |
| 11/6/1993 | Acquired Valley Federal Savings and Loan Association ([redacted] in EASTON, PA |
| 8/5/1994 | Acquired Shadow Lawn Savings Bank, SLA [redacted] in LONG BRANCH, NJ |
| 10/31/1994 | Acquired Charter Federal Savings Bank [redacted] in RANDOLPH TOWNSHIP, NJ |
| 5/31/1996 | Acquired West Jersey Community Bank [redacted] in FAIRFIELD, NJ |
| 12/23/1996 | Changed name to **Sovereign Bank** [redacted] |
| 2/19/1997 | Acquired First Dewitt Bank [redacted] in WEST CALDWELL, NJ |
| 3/31/1997 | Acquired Sovereign Community Bank [redacted] in FREEHOLD, NJ |
| 8/30/1997 | Acquired Bankers Savings [redacted] in PERTH AMBOY, NJ |

| Date | Event |
|---|---|
| 3/1/1998 | Acquired Main Line Bank [redacted]n VILLANOVA, PA |
| 7/31/1998 | Acquired First Home Savings Bank, F.S.B. ([redacted]) in PENNSVILLE, NJ |
| 7/31/1998 | Acquired Carnegie Bank, National Association ([redacted] in LANGHORNE, PA |
| 6/30/1999 | Change trust powers from TRUST POWERS NOT GRANTED to FULL TRUST POWERS GRANTED |
| 6/30/1999 | Acquired Trenton Savings Bank FSB ([redacted]in LAWRENCEVILLE, NJ |
| 3/8/2002 | Acquired Main Street Bank [redacted]) in READING, PA |
| 5/3/2002 | Acquired Sovereign Trust Company ([redacted] in MANCHESTER TOWNSHIP, NJ |
| 2/6/2004 | Acquired First Essex Bank [redacted]) in LAWRENCE, MA |
| 7/23/2004 | Acquired Nantucket Bank [redacted]) in NANTUCKET, MA |
| 7/23/2004 | Acquired Compass Bank for Savings[redacted] in NEW BEDFORD, MA |
| 2/11/2005 | Acquired Waypoint Bank ([redacted]) in HARRISBURG, PA |
| 9/8/06 ~~9/9/2006~~ | Acquired Independence Community Bank ([redacted] in BROOKLYN, NY |
| 6/20/2011 | Moved bank headquarters from WYOMISSING, PA to WILMINGTON, DE |
| 7/21/2011 | Changed primary regulatory agency from OFFICE OF THRIFT SUPERVISION to COMPTROLLER OF THE CURRENCY |
| 1/26/2012 | Changed organization type to COMMERCIAL BANK |
| 1/26/2012 | Changed name to **Sovereign Bank, National Association** [redacted] |
| 1/26/2012 | Changed institution class to INSURED COMMERCIAL BANK, NATIONAL, MEMBER FRS |

FFIEC home | Federal Reserve Board home

Accessibility | Disclaimer | Privacy Policy

# National Information Center

NIC Home | Institution Search | USBA Search | Top 50 HCs | BHCPR Peer Reports | FAQ

**Institution History for** SANTANDER BANK, NATIONAL ASSOCIATIO[redacted]

10 Institution history record(s) found.

< Previous Page 1 Next >

| Event Date | Historical Event |
|---|---|
| 1902-01-01 | WYOMISSING NEW HOME FEDERAL SAVINGS & LOAN ASSOCIATION located at 840 PENN AVENUE, WYOMISSING, PA was established as a Savings & Loan Association. |
| 1980-11-03 | WYOMISSING NEW HOME FEDERAL SAVINGS & LOAN ASSOCIATION was renamed to NEW HOME FEDERAL SAVINGS & LOAN ASSOCIATION. |
| 1984-01-01 | NEW HOME FEDERAL SAVINGS & LOAN ASSOCIATION was renamed to PENN SAVINGS BANK, FSB and changed from Savings & Loan Association to Federal Savings Bank. |
| 1986-12-01 | PENN SAVINGS BANK, FSB moved to 840 PENN AVE WYOMISSING, PA. |
| 1988-01-02 | PENN SAVINGS BANK, FSB moved to 1130 BERKSHIRE BLVD WYOMISSING, PA. |
| 1991-12-31 | PENN SAVINGS BANK, FSB was renamed to SOVEREIGN BANK,FSB. |
| 1996-12-23 | SOVEREIGN BANK,FSB was renamed to SOVEREIGN BANK. |
| 2011-06-20 | SOVEREIGN BANK moved to 824 NORTH MARKET STREET, SUITE 100 WILMINGTON, DE. |
| 2012-01-26 | SOVEREIGN BANK was renamed to SOVEREIGN BANK, NATIONAL ASSOCIATION and changed from Federal Savings Bank to National Bank. |
| 2013-10-17 | SOVEREIGN BANK, NATIONAL ASSOCIATION was renamed to SANTANDER BANK, NATIONAL ASSOCIATION. |

Page 1 of 1

NIC Home | FAQ | Help | Contact Us